IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

JOSE REYES

CRIMINAL CASE NO.

1:11-cr-00009-ODE-RGV

1:11-cr-00060-ODE-RGV

## ORDER FOR SERVICE OF FINAL REPORT AND RECOMMENDATION

Attached is the Final Report and Recommendation of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. Local Criminal Rule 59(2)(a)-(b). Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. Failure to object to this Report and Recommendation waives a party's right to review. Fed. R. Crim. P. 59(b)(2).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(F), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED** and **DIRECTED**, this 29th day of August, 2011.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL CASE NO. |
| v. | 1:11-cr-00009-ODE-RGV |
| | 1:11-cr-00060-ODE-RGV |
| JOSE REYES | |

**MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION**

Pending before the Court are motions to suppress evidence and statements filed by defendant Jose Reyes ("Reyes"), also known as Tulile, in two criminal cases. See Criminal Case No. 1:11-cr-00009-ODE-RGV ("Cr. No. 9"), [Doc. 87]; Criminal Case No. 1:11-cr-00060-ODE-RGV ("Cr. No. 60"), [Doc. 26].[1] The pending motions

---

[1] Reyes moves to suppress all evidence and statements arising from and following his arrests on July 3 and July 10, 2009. Cr. No. 9, [Docs. 87 & 132]; Cr. No. 60, [Docs. 26 & 63]. Additionally, Reyes initially filed preliminary motions to suppress intercepted communications, Cr. No. 9, [Doc. 86]; Cr. No. 60, [Doc. 25], and during a pretrial conference and the subsequent evidentiary hearing, he was provided additional time within which to perfect the motions, Cr. No. 9, [Docs. 92 & 110]; Cr. No. 60, [Doc. 28; Doc. 57 at 3-6]. Reyes never perfected the motions within the time allotted. "By failing to perfect the motion[s], the undersigned concludes that [Reyes] abandoned his motion[s] to suppress [intercepted communications]." United States v. Elder, Criminal Action File No. 1:10-CR-132-RWS/AJB, 2010 WL 5656687, at *3 (N.D. Ga. Dec. 16, 2010), adopted in part by 2011 WL 294507, at *7 (N.D. Ga. Jan. 27, 2011) (citations omitted). See also United States v. Duruoha, Criminal Case No. 1:10-CR-00343-CAP-RGV, 2010 WL 5055905, at *1 (N.D. Ga. Oct. 29, 2010), adopted by 2010 WL 5055791, at *1 (N.D. Ga. Dec. 6, 2010). Accordingly, it is hereby **RECOMMENDED** that Reyes' motions to suppress intercepted communications, Cr. No. 9, [Doc. 86]; Cr. No. 60, [Doc. 25], be deemed **ABANDONED** and **DENIED**.

have been fully briefed, and are ready for ruling.[2]  For the following reasons, it is hereby **RECOMMENDED** that Reyes' motions to suppress evidence and statements, Cr. No. 9, [Doc. 87]; Cr. No. 60, [Doc. 26], be **DENIED**.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.    Indictments

On January 18, 2011, a grand jury in the Northern District of Georgia returned a twelve-count indictment against Reyes and seven co-defendants.  See Cr. No.9, [Doc. 1].  Specifically, Reyes is charged in Count One with willfully conspiring to knowingly and intentionally possess with the intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A); in Count Three with knowingly attempting to possess with the intent to distribute at least 500 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and 18 U.S.C. § 2; in Count Seven with knowingly attempting to obstruct, delay, and affect commerce and the movement of articles and commodities in such commerce by robbery, in violation of 18 U.S.C. §§ 1951(a) and 2; in Count Eight with willfully conspiring to take and obtain property by means of actual and threatened force,

---

[2] On May 9, 2011, the Court held an evidentiary hearing on Reyes' motions to suppress evidence and statements, see Cr. No. 9, [Doc. 121]; Cr. No. 60, [Doc. 57], and citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)."  Additionally, the parties submitted exhibits during the hearing, which will be referred to as "(Gov. Ex. ___)" for the government's exhibits and "(Reyes Ex. ___")" for Reyes' exhibit.

violence, and intimidation from the presence of individuals engaged in an activity affecting interstate commerce, in violation of 18 U.S.C. § 1951(a); in Count Nine with knowingly possessing with the intent to distribute at least 500 grams of cocaine, in violation of 21 U.S.C. § 841(b)(1)(B) and 18 U.S.C. § 2; in Count Eleven with knowingly possessing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(1); and in Count Twelve with being an alien in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2).  [Id.].

On February 16, 2011, a grand jury in the Northern District of Georgia returned a separate ten-count indictment against Reyes and five co-defendants.  See Cr. No. 60, [Doc. 1].  In particular, Reyes is charged in Count One with willfully conspiring to take and obtain and actually taking property by means of actual and threatened force, violence, and intimidation from the presence of individuals engaged in an activity affecting interstate commerce, with said property consisting of illegal drugs and proceeds from drug trafficking, in violation of 18 U.S.C. § 1951(a); in Count Eight with knowingly obstructing, delaying, and affecting commerce and the movement of articles and commodities in such commerce by robbery, in violation of 18 U.S.C. §§ 1951(a) and 2; in Count Nine with knowingly attempting to possess with the intent to distribute at least five kilograms of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) and 18 U.S.C. § 2; and in Count Ten

3

with knowingly possessing with the intent to distribute at least 500 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and 18 U. S. C. § 2.  [Id.].[3]

## B.   Statement of Facts

In June of 2009, detectives with the Gwinnett County Police Department ("GCPD") began investigating violent home invasions that were occurring against drug trafficking organizations, and learned, through their use of wiretap and physical surveillance, the identities of some of the alleged perpetrators as well as the make and model of some of their vehicles.  (Tr. at 38-39, 54, 59-60, 78, 82).  In connection with this investigation, on the afternoon of July 3, 2009, GCPD Sergeant Edward Restrepo ("Sgt. Restrepo"), contacted GCPD Officer Kevin Sipple ("Officer Sipple")[4] and asked him to initiate a traffic stop of a tan Mercury Mountaineer Sport Utility vehicle (the "Mountaineer")[5] based on his own independent probable cause. Sgt. Restrepo suspected that the vehicle was involved in criminal activity based on

---

[3] The indictments also include forfeiture provisions.  No. Cr. 9, [Doc. 1 at 10-12]; No. Cr. 60, [Doc. 1 at 11-13].

[4] Officer Sipple testified that he had been employed with the GCPD since July of 1999, and at the time of the evidentiary hearing, he was assigned to the Drug Enforcement Administration High Intensity Drug Trafficking Area Task Force.  (Tr. at 10-11).

[5] At the time Sgt. Restrepo contacted Officer Sipple, the Mountaineer was parked in a commercial parking lot located off of Sweetwater Road in between Pleasant Hill and Club Drive.  (Tr. at 11).

4

intercepted communications from earlier that day.  (Tr. at 11-13, 18-19, 39-40, 53-56, 58, 60-61).

Officer Sipple, who was nearby in a marked patrol vehicle, drove to a location where he could observe the Mountaineer parked in front of a bar, and he noticed that the rear and side windows of the vehicle were deeply tinted.  (Tr. at 11-12, 19-21; Gov. Ex. 1).  Officer Sipple could not see if anyone was in the Mountaineer, but after a few minutes, the vehicle exited the parking lot, and Officer Sipple followed it for a short period of time, and then initiated a traffic stop based on the darkly tinted windows.[6]  (Tr. at 11-12, 20-21, 23, 36; Gov. Ex. 1).  Officer Sipple exited his vehicle, approached the driver's side of the Mountaineer, identified himself and explained why he had stopped the vehicle, and asked the driver, later identified as Reyes, for his driver's license.[7]  (Tr. at 13-14, 21-23).  In response, Reyes produced a

---

[6] It is a violation of Georgia law for "any person to operate a motor vehicle . . . [w]hich has material and glazing applied or affixed to the rear windshield or the side or door windows, which material and glazing when so applied or affixed reduce light transmission through the windshield or window to less than 32 percent, plus or minus 3 percent, or increase light reflectance to more than 20 percent." O.C.G.A. § 40-8-73.1(b)(2); see also (Tr. at 12).  Officer Sipple testified that "any time there is window tint placed on there, the vehicle can be stopped and be checked with a tint meter that . . . was assigned."  (Tr. at 12).  In fact, Officer Sipple testified that under Georgia law, "you can stop the vehicle that has tint on there, whether it's legal or not.  You can stop it to test it."  (Tr. at 24, 36).

[7] Officer Sipple testified that he spoke to Reyes primarily in English, and that, despite "a little bit" of a language barrier, Reyes was able to converse and respond appropriately.  (Tr. at 22, 29).

5

Puerto Rican driver's license bearing the name "Jesus Vasquez Reyes," and Officer Sipple returned to his patrol vehicle and ran the information on this license through the National Crime Information Center ("NCIC") and the Georgia Crime Information Center ("GCIC") databases. (Tr. at 14, 23, 25, 28, 30, 32-33; Reyes Ex. 1). The NCIC and GCIC databases returned information which showed that the address on the license did not match the updated address on file in the system. (Tr. at 14, 25-27, 57).[8]

Officer Sipple returned to the Mountaineer and asked Reyes about the address and whether he had moved, but Reyes maintained that he lived at the address listed on the license. (Tr. at 15, 27-28). Because "things just weren't adding up," Officer Sipple asked Reyes whether he had any other form of identification, and Reyes responded by providing him with different names and birth dates. (Tr. at 15, 27-29, 35-36, 56). Specifically, Reyes provided Officer Sipple with a receipt for a money transfer that bore the name "Melvin Mata," and then he subsequently identified himself as "Luis Reyes." (Tr. at 15-16, 28, 30, 32, 35-36, 57, 77; Reyes Ex. 1). At this time, Officer Sipple placed Reyes under arrest for providing a false name and date

---

[8] At the time of the stop, there was also a passenger seated in Reyes' vehicle, and he likewise provided Officer Sipple with Puerto Rican identification, which matched the information provided in NCIC and GCIC. (Tr. at 14, 16, 28).

of birth to a law enforcement officer in violation of O.C.G.A. § 16-10-25.[9]  (Tr. at 15-16, 29-30, 35, 56).  Officer Sipple asked the passenger if there was someone he could call to come retrieve Reyes' vehicle, and at the request of the passenger, Ada Cordero, a co-defendant in Cr. No. 9, arrived at the scene and took possession of the vehicle.  (Tr. at 25, 30, 76).  Reyes was then transported to the Gwinnett County Detention Center, and as part of his routine booking procedure, he provided his real name of "Jose Reyes" and his date of birth.  (Tr. at 16-17, 30-31).[10]

Approximately one week later, on July 10, 2009, Sgt. Restrepo, based on evidence gathered through the wiretap interceptions, organized with his arrest team a take-down of individuals, including Reyes, suspected of being involved in coordinating an impending armed robbery against Alejandro Gomez ("Gomez").  (Tr. at 40-43, 58-59, 63-66, 77-78, 82).  The first arrest followed a traffic stop in which David Garcia-Hernandez ("Hernandez") and Gabriel Payamps ("Payamps"), two of Reyes' co-defendants in Cr. No. 9, were apprehended with a kilogram of cocaine.

---

[9] Pursuant to O.C.G.A. § 16-10-25, it is a violation to give "a false name, address, or date of birth to a law enforcement officer in the lawful discharge of his official duties with the intent of misleading the officer as to his identity or birthdate."

[10] Prior to Reyes providing his legal name during the booking procedure, Officer Sipple advised him that if he did not provide his real identity, he would sit there for a couple of days while the officers try to identify him or he could simply tell him exactly who he is.  (Tr. at 17).

(Tr. at 40, 42).[11]  Following Hernandez and Payamps' arrest, the arrest team tracked the Mountaineer that Reyes had driven on July 3, 2009, to a shopping center, and they arrested Reyes and other individuals at this location.  (Tr. at 40-41, 43-44, 65, 70).

Subsequently, the officers transported all of the arrestees to GCPD headquarters at which time Detective Andy Rodriguez ("Det. Rodriguez") advised the arrestees, including Reyes, as a group, of their <u>Miranda</u>[12] rights by reading these rights in Spanish from a GCPD form.  (Tr. at 44-46, 68, 83-86, 92-93; Gov. Ex. 10). Specifically, Det. Rodriguez advised the arrestees that they had the right to remain silent and that any statements they made could be used against them in court.  (Tr. at 87).  He further advised them that they had the right to speak to an attorney, to have one present during the questioning, to have one appointed for them if they could not afford one, and, in the event they proceeded with questioning without an attorney, to stop answering questions at any time.  (<u>Id.</u>).  Thereafter, Reyes was placed in a separate interview room, and Det. Rodriguez, after advising Reyes of his <u>Miranda</u> rights in Spanish for a second time, proceeded to interview him.  (Tr. at 46,

---

[11] Gomez was present in the vehicle when Hernandez and Payamps were arrested.  (Tr. at 42-43).

[12] <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

88-90; Gov. Ex. 8).[13]  Det. Rodriguez did not make any threats or promises to Reyes to induce him to waive his rights and agree to speak with him, nor did he display any force.  (Tr. at 87, 89).  At no point during the interview did Reyes ask to stop the interview, nor did he request the presence of an attorney.  (Tr. at 91).

Sgt. Restrepo testified that the Mountaineer was impounded as evidence of a crime pursuant to GCPD policy, which provides that officers may impound a vehicle and place it on "hold" if it is evidence in a crime, if it was used in the transportation of contraband and is to be condemned, if there is a question as to who the lawful owner of the vehicle is, or if it is needed as part of an ongoing investigation.  (Tr. at 46-47, 69, 71-72; Gov. Ex. 2).  GCPD policy also authorizes an inventory search of the vehicle before impound, which was conducted in this case. (Tr. at 47; Gov. Ex. 2).[14]  Thereafter, on July 14, 2009, Sgt. Restrepo participated in a second search of the Mountaineer as part of an administrative step in the forfeiture

---

[13] Prior to advising Reyes of his rights for a second time, Det. Rodriguez asked Reyes a series of questions in an effort to establish a rapport with him.  (Tr. at 88-89, 92-94).  Det. Rodriguez's interview of Reyes was videotaped.  (Tr. at 90; Gov. Ex. 8).

[14] Specifically, GCPD's policy mandates that the passenger and trunk compartments, including all packages and locked or unlocked containers, the glove box whether locked or unlocked, and any other area or compartment designed to hold personal property whether locked or unlocked will be inventoried prior to impound.  (Gov. Ex. 2).

process, and the officers recovered a firearm and related ammunition from the glove

box compartment area of the vehicle.[15]  (Tr. at 48-51, 75; Gov. Exs. 3-7).[16]

---

[15] The GCPD forfeiture procedure provides in relevant part:

A complete inventory of the seized property and all containers, open or closed, found therein will be completed at the time of the seizure or as soon as practical after the seizure.

. . .

The vehicle and all contraband or evidence should be photographed in positions and conditions in which they were found, if possible.

(Gov. Ex. 3; see also Tr. at 48-51).

[16] On October 14, 2009, Reyes made certain statements to Immigration and Customs Enforcement ("ICE") Special Agent Hector Zeda, which Reyes moves to suppress.  Cr. No. 60, [Doc. 26]; see also (Tr. at 7).  However, the government has conceded that it will not offer these statements.  (Tr. at 7).  Additionally, on March 1, 2010, ICE Special Agents Christian Owen ("Agent Owen") and Stewart Regan ("Agent Regan") interviewed Reyes at the Gwinnett County Jail regarding his immigration status.  (Tr. at 96-97, 99; Gov. Ex. 9).  Agent Owen was aware that Reyes was represented on his criminal charges, and he at no point during the interview discussed the criminal charges with Reyes.  (Tr. at 97, 99).  Prior to interviewing him, Agent Regan advised Reyes of his Miranda rights in Spanish, and Reyes initialed a Statement of Rights form, acknowledging that he had been given his rights.  (Tr. at 97-98; Gov. Ex. 9).  Reyes also initialed a Waiver of Rights form in which he, among other things, acknowledged that he did not wish to have a lawyer or any other person present "for immigration questions."  (Tr. at 99; Gov. Ex. 9).  The agents did not make any threats or promises to Reyes to induce him to waive his rights and agree to speak with them, nor did they display any force.  (Tr. at 98).  The government intends to introduce statements made by Reyes during this interview, Cr. No. 60, [Doc. 59 at 3], and Reyes has not challenged or made any arguments with regard to these statements, see generally Cr. No. 60, [Doc. 63].

## II.  DISCUSSION

Reyes challenges the initial traffic stop on July 3, 2009, as not supported by reasonable suspicion or probable cause, and therefore, contends that all evidence and statements arising therefrom are due to be suppressed.  Cr. No. 60, [Doc. 63].  Reyes also briefly raises the issue of whether there was a valid inventory search of the Mountaineer on July 14, 2009.  [Id. at 7-8].[17]

### A.     Validity of Initial Traffic Stop

"The Fourth Amendment protects individuals from unreasonable search and seizure."  United States v. Rowls, 402 F. App'x 467, 468 (11th Cir. 2010) (per curiam) (unpublished) (internal marks and citation omitted).  The "[t]emporary detention of individuals during the stop of an automobile by the police, even if for only a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]."  Whren v. United States, 517 U.S. 806, 809-10 (1996) (citations omitted).  See also United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001);  United States v. Edenilson-Reyes, Criminal Action File No. 1:09–CR–00361–RWS–AJB, 2010 WL 5620439, at *9 (N.D. Ga. Oct. 26, 2010), adopted

---

[17] In its initial brief in opposition to Reyes' suppression motions, the government proffered specific arguments regarding, among other things, statements made by Reyes on July 3, 2009, July 10, 2009, and March 1, 2010, Cr. No. 60, [Doc. 59 at 10-17], which Reyes has not addressed in his post-hearing brief.  In fact, Reyes only challenges the initial traffic stop on July 3, 2009, and the fruits thereof, and the July 14, 2009, inventory search of the Mountaineer.  Cr. No. 60, [Doc. 63].

by 2011 WL 195679, at *1 (N.D. Ga. Jan. 20, 2011).  A traffic stop is reasonable if the officer had probable cause to believe that a traffic violation has occurred, or if the traffic stop is justified by reasonable suspicion in compliance with Terry v. Ohio, 392 U.S. 1 (1968).  Edenilson-Reyes, 2010 WL 5620439, at *9 (citing United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009) (citation omitted)).  See also United States v. Monzon-Gomez, 244 F. App'x 954, 959 (11th Cir. 2007) (per curiam) (unpublished); United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999); United States v. Sierra, Cr. No. 2:10cr183–MEF, 2011 WL 1675217, at *2 (M.D. Ala. Apr. 19, 2011), adopted by 2011 WL 1675180, at *1 (M.D. Ala. May 4, 2011).  Thus, "[a] traffic stop . . . is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion. . . ."  Edenilson-Reyes, 2010 WL 5620439, at *9 (alterations in original) (internal marks and citations omitted).  See also United States v. Boyd, 388 F. App'x 943, 947 (11th Cir. 2010) (per curiam) (unpublished); United States v. Woods, 385 F. App'x 914, 915 (11th Cir. 2010) (per curiam) (unpublished).

An officer's subjective intentions and opinions are irrelevant where the officer has probable cause for the stop.  See United States v. Mwangi, Criminal File No. 1:09-CR-107-TWT, 2010 WL 520793, at *3 n.9 (N.D. Ga. Feb. 5, 2010), adopted at *1 (citations omitted).  See also United States v. Arango, 396 F. App'x 631, 632-33 (11th

Cir. 2010) (per curiam) (unpublished) ("Where objectively reasonable conditions permit a stop, the officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment.") (internal marks and citation omitted); Miller v. Harget, 458 F.3d 1251, 1260 (11th Cir. 2006) ("It is well-settled that an officer's subjective motivations do not affect whether probable cause existed") (citations omitted); United States v. Jimenez, No. 2:06-cr-74-FtM-29DNF, 2006 WL 2927477, at *2 (M.D. Fla. Oct. 11, 2006) (holding that "an officer's belief that he has probable cause or does not have probable cause is simply not a pertinent factor" in determining whether an arrest is lawful). That is, "if the driver of a car has broken a traffic law, no matter how relatively minor, a motion to suppress evidence cannot be based on the argument that the stop was pretextual." United States v. Wright, No. CR210-022, 2010 WL 4967468, at *1 (S.D. Ga. Nov. 5, 2010), adopted by 2010 WL 4967838, at *1 (S.D. Ga. Dec. 1, 2010) (citation omitted).

In addition, "[t]he propriety of the traffic stop . . . does not depend on whether the defendant is actually guilty of committing a traffic offense." United States v. Sicairos-Sicairos, Criminal Action File No. 4:10–CR–054–HLM, 2011 WL 2710031, at *5 (N.D. Ga. July 11, 2011) (citation omitted). "Instead, the relevant question is

13

whether it was reasonable for the officer to believe that a traffic offense had been committed." Id. (citation omitted).

Reyes argues that Officer Sipple stopped him, not because of the tinted windows, but because he was instructed by Sgt. Restrepo "to come up with a pretext to stop the vehicle." Cr. No. 60, [Doc. 63 at 3]. In this regard, Reyes argues that Officer Sipple "did not see a traffic violation he just imagined there might be one based on a possible improper tint and/or his belief that he could stop any vehicle with a dark tint." [Id. at 5-6]. Officer Sipple testified that he initiated a traffic stop of Reyes' vehicle because the window tint on the rear and side windows appeared to be "tinted too deeply," in violation of Georgia law, (Tr. at 12, 21), which "was sufficient to lead a reasonable officer to believe that [Reyes] had violated [O.C.G.A.] § 40-8-73.1(b) by operating a motor vehicle with window tinting that exceeded the allowable limits . . . regardless of whether the tinting was actually illegal," United States v. Garcia, 284 F. App'x 791, 793 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted); see also State v. Simmons, 640 S.E.2d 709, 711-12 (Ga. Ct. App. 2006) (suspected illegal tint justified initial traffic stop).

Reyes acknowledges Whren and its progeny, but he argues that "[t]his was clearly an investigatory stop, not a stop based on probable cause." Cr. No. 60, [Doc. 63 at 4]. However, "[t]his contention is unpersuasive, as it appears to confuse the

14

standards for probable cause with those for a violation." United States v. Alvardo, No. 8:10-CR-348-T-30TGW, 2010 WL 5262736, at *4 (M.D. Fla. Nov. 17, 2010), adopted by 2010 WL 5262735, at *1 (M.D. Fla. Dec. 17, 2010).  Indeed, "[t]he Eleventh Circuit rejected this argument, stating that police do not have to ascertain conclusively whether a window-tint violation has occurred before there is probable cause to investigate it."  Id. (citing United States v. Weaver, 145 F. App'x 639, 641 (11th Cir. 2005) (per curiam) (unpublished)).  In fact, "the Eleventh Circuit noted that no officer knows the window transmittance percentage based on observation and, thus, if such knowledge was required to establish probable cause, an officer could never stop a vehicle for a violation of this statute independent of another infraction." Id. (citing Weaver, 145 F. App'x at 641).

Having probable cause to stop Reyes for a traffic offense, it was irrelevant that Officer Sipple was primarily looking to stop the vehicle based on Sgt. Restrepo's instruction. United States v. Gonzalez, No. 2:09-cr-29-FtM-29SPC, 2009 WL 3230787, at *7 (M.D. Fla. Oct. 2, 2009), adopted at *3 ("Whether or not [the officer] used the tint violation as a pretext to make the traffic stop does not effect the validity of the stop.").  See also Miller, 458 F.3d at 1260; Simmons, 172 F.3d at 778; Mwangi, 2010 WL 520793, at *3 n.9.  In short, Officer Sipple's testimony established that he had probable cause to believe that the window tinting on Reyes' vehicle violated Georgia

15

law, which is "all that is necessary to conduct a traffic stop."[18]  <u>Alvardo</u>, 2010 WL 5262736, at *5 (citation omitted).  <u>See also</u> <u>United States v. Harrell</u>, 268 F.3d 141, 149 (2d Cir. 2001) (finding that where an objectively reasonable officer would have suspected that windows on defendant's vehicle were tinted in violation of state law, officers had probable cause to stop the vehicle); <u>United States v. Hudson</u>, No. 09-20672-CR, 2009 WL 3448214, at *6 (S.D. Fla. Oct. 26, 2009), adopted at *2.

Reyes also contends that Officer Sipple unreasonably extended the traffic stop, arguing that he "was not detained only as long as necessary to investigate probable cause of criminal activity," but "was detained just as long as it took to manufacture evidence of criminal activity– a false name."  Cr. No. 60, [Doc. 63 at 4, 6-7].  "[A]n officer's actions during a traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place, and the stop may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity." <u>Garcia</u>, 284 F. App'x at 794 (alteration

---

[18] "Since the Court concludes probable cause supported [Officer Sipple's] decision to stop [Reyes'] vehicle, the stop also was supported by reasonable suspicion, a lesser degree of proof than probable cause."  <u>United States v. Shirley</u>, Criminal Action File No. 1:10-CR-167-JEC/AJB, 2010 WL 5390138, at *5 n.8 (N.D. Ga. Nov. 10, 2010), adopted by 2010 WL 5390133, at *1 (N.D. Ga. Dec. 22, 2010). <u>See also</u> <u>United States v. Johnson</u>, No. CR05-4063-MWB, 2005 WL 2704892, at *7 (N.D. Iowa Oct. 20, 2005) (officer's "observation of the darkly tinted windows on the [vehicle] provided him with at most probable cause and no less than reasonable suspicion to believe that the [vehicle's] windows had an excessive tint, in violation of [state] law, justifying stop of the vehicle.").

in original) (internal marks and citation omitted).  "[A]n officer may prolong the stop to investigate the driver's license and the vehicle registration and to perform a computer check."  Edenilson-Reyes, 2010 WL 5620439, at *10 (citation omitted). "The officer can lawfully ask questions, even questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's license so long as it does not prolong beyond the time reasonably required to complete that mission."  United States v. Cantu, 227 F. App'x 783, 785 (11th Cir. 2007) (per curiam) (unpublished) (internal marks and citation omitted).  "Ordinarily, when a citation or warning has been issued and all record checks have been completed and come back clean, the legitimate investigative purpose of the traffic stop is fulfilled."  Edenilson-Reyes, 2010 WL 5620439, at *10  (internal marks and citation omitted).

"However, a traffic stop may last longer than the purpose of the stop would ordinarily permit if an officer, based on specific facts and rational inferences drawn from those facts in light of his training and experience, has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring."  United States v. DeJesus, No. 10–12985, 2011 WL 3252320, at *4 (11th Cir. July 28, 2011) (per curiam) (unpublished) (citations omitted).  That is, "[a]n investigative stop can grow out of a traffic stop so long as the officer has reasonable suspicion of criminal

17

activity to expand his investigation, even if his suspicions were unrelated to the traffic offense that served as the basis of the stop." United States v. Gomez Serena, 368 F.3d 1037, 1041 (8th Cir. 2004) (citation omitted).  Furthermore, where an officer initiates a legal stop, he has "the duty to investigate suspicious circumstances that then [come] to his attention."  Cantu, 227 F. App'x at 785 (alteration in original) (internal marks and citation omitted).

Here, Officer Sipple testified that after he approached Reyes and obtained his Puerto Rican driver's license, he returned to his patrol car and ran the information on the license through NCIC and GCIC.  (Tr. at 14, 23, 25, 28, 30, 32-33).  While Officer Sipple was reviewing Reyes' license information, he observed that the address on the license was different from the address revealed by the computer check. (Tr. at 14, 25-27, 57).  Therefore, Officer Sipple asked Reyes about the address and whether he had moved, and when Reyes insisted that his address was the address on the license and not the more recent address in the database, it was reasonable for Officer Sipple to ask additional questions. See United States v. Ellis, 497 F.3d 606, 614 n.1 (6th Cir. 2007) ("It is well established that an officer is free to ask traffic-related questions, and questions about a driver's identity, business and his travel plans during the course of a traffic stop.") (internal marks and citation omitted).

Officer Sipple was justified in prolonging the detention in order to confirm or dispel his articulable suspicion that Reyes violated Georgia law by providing him with a false name and date of birth. See Simmons, 172 F.3d at 779-80; United States v. Garcia-Aleman, No. 1:10-CR-29, 2010 WL 2635071, at *1 (E.D. Tex. June 9, 2010), adopted by 2010 WL 2635073, at *1 (E.D. Tex. June 30, 2010) ("[I]f additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, the detention may continue until the new reasonable suspicion has been dispelled or confirmed.") (citations omitted).  In fact, "the brief detention was a reasonable response to the totality of the circumstances," Ellis, 497 F.3d at 614, and Officer Sipple "diligently pursued a means of investigation that was likely to confirm or dispel his suspicions as quickly as possible," Johnson, 2005 WL 2704892, at *6.  In response to Officer Sipple's request for additional identification, Reyes immediately began providing different names, including "Melvin Mata" and "Luis Reyes," and different birth dates.  (Tr. at 15-16, 27-29, 30, 32, 35-36, 56-57, 77; Reyes Ex. 1).  At this point, Officer Sipple had probable cause to arrest Reyes for providing a false name and date of birth in violation of O.C.G.A. § 16-10-25.  In short, because Officer Sipple had probable cause to stop Reyes for a traffic violation, his temporary detention and subsequent arrest were valid.

19

**B.    July 14, 2009, Search of the Mountaineer**

Reyes contends that the "second 'inventory' search which produced the gun was conducted 4 days after initial impoundment search" when "[t]here was ample time to get a warrant and there were no exigent circumstances," and was "not the result of a standard inventory search but was the product of an exhaustive investigative search in which the gun was found lodged behind the glove compartment."  Cr. No. 60, [Doc. 63 at 7].[19]  The Court finds that the evidence recovered from the Mountaineer on July 14, 2009, was lawfully seized for the following reasons.

In South Dakota v. Opperman, 428 U.S. 364, 376 (1976), the Supreme Court held that police impoundment and search of vehicles pursuant to the department's standard operating procedure ("SOP") do not violate the Fourth Amendment.  The Eleventh Circuit, in Sammons v. Taylor, 967 F.2d 1533 (11th Cir. 1992), defined the framework of the inventory-search exception to the warrant requirement as follows:

> Even if an arrestee's vehicle is not impeding traffic or otherwise presenting a hazard, a law enforcement officer may impound the vehicle, so long as the decision to impound is made on the basis of standard criteria and on the basis of something other than suspicion of

---

[19]  Reyes has not challenged the initial determination to impound the Mountaineer after his arrest on July 10, 2009, and the Court finds that it was lawfully impounded pursuant to GCPD's policy.  See (Gov. Ex. 2).

20

> evidence of criminal activity.[20] If the vehicle has been lawfully
> impounded, the law enforcement officer may conduct an inventory
> search, including a search of closed containers, provided the search is
> conducted pursuant to standardized criteria.  Because an inventory
> search is an exception to the Fourth Amendment's warrant
> requirement, however, the government officer has the burden to show
> that the requirements of the inventory search exception have been met.

Id. at 1543 (footnote added) (citing Coolidge v. New Hampshire, 403 U.S. 443, 455

(1971)) (internal marks omitted).  Therefore, "[i]nventory searches are appropriate

where police have the authority to impound a vehicle and the search is consistent

with established policy."  United States v. Davis, No. 2:07-cr-0248-WKW, 2008 WL

1927377, at *3 (M.D. Ala. Apr. 28, 2008), adopted at *2 (citing United States v.

Williams, 936 F.2d 1243, 1248 (11th Cir. 1991)).  See also United States v. Westerman,

418 F. App'x 822 (11th Cir. 2011) (per curiam) (unpublished); United States v.

Lariscy, No. CR607-10, 2008 WL 621216, at *4 (S.D. Ga. Mar. 4, 2008) (citing Colorado

v. Bertine, 479 U.S. 367, 372 (1987) & Williams, 936 F.2d at 1248 ("It is well settled

that police officers may conduct inventory searches of vehicles lawfully in their

custody provided the inventory is conducted pursuant to standardized government

procedures.").  "The Supreme Court and lower federal courts have strictly adhered

to the requirement that, for a search to be justified as an inventory, there must be a

-----

[20] "At the same time, the mere expectation of uncovering evidence will not
vitiate an otherwise valid inventory search."  Shirley, 2010 WL 5390138, at *13
(internal marks and citations omitted).

21

standard inventory policy, and the officer's conduct must not exceed that which is allowed under the policy." Shirley, 2010 WL 5390138, at *14 (citations omitted). "Generally, 'reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment.'" United States v. Richardson, 121 F.3d 1051, 1055 (7th Cir. 1997) (quoting Bertine, 479 U.S. at 374).

"Three interests justify this exception, namely (1) protection of the owner's property found in the vehicle, (2) protection of the police from false claims of lost possessions, and (3) protection of the police from potential danger." United States v. Wright, Criminal Action No. 2:07cr91-MHT, 2007 WL 4287803, at *3 (M.D. Ala. Nov. 30, 2007), adopted at *1. See also United States v. Grossman, 233 F. App'x 963, 968 (11th Cir. 2007) (per curiam) (unpublished); United States v. Beckford, No. 1:09-CR-263-TWT-GGB, 2010 WL 1487817, at *4 (N.D. Ga. Feb. 2, 2010), adopted in part at 2010 WL 1489970, at *1 (N.D. Ga. Apr. 13, 2010). An inventory search is also lawful even though it may be an investigatory search, "so long as [the inventory] was *one* of the police motives." United States v. Orozco, 715 F.2d 158, 161 (5th Cir. 1983) (per curiam). See also Shirley, 2010 WL 5390138, at *14 ("[A] number of courts have ruled that the presence of dual motivation does not invalidate an otherwise valid inventory search.").

Furthermore, "a pre-forfeiture inventory search of a vehicle does not require a warrant." United States v. Smith, 510 F.3d 641, 651 (6th Cir. 2007) (citing United States v. Decker, 19 F.3d 287, 290 (6th Cir. 1994) (per curiam) ("'[W]here police have probable cause to believe a car is subject to forfeiture, or have validly seized a car for forfeiture, [the police] may search the car without a warrant.'") (alterations in original) (citation omitted)).   In fact, "[w]hen a vehicle is seized for forfeiture purposes, a warrantless inventory search can be made," and "seizure of [the] vehicle for forfeiture need not be contemporaneous with events giving law enforcement officials probable cause for forfeiture." United States v. Walker, 900 F.2d 1201, 1205 (8th Cir. 1990) (per curiam) (citations omitted).

It is undisputed that the GCPD had a comprehensive impound and inventory policy in place at the time Sgt. Restrepo impounded the Mountaineer.  [Gov. Exs. 2 & 3].  Although Reyes contends that the officers exceeded the scope of a lawful inventory search, Cr. No. 60, [Doc. 63 at 7-8], it is undisputed that the GCPD policy regarding forfeiture procedure provides that "[a] complete inventory of the seized property and all containers, open or closed, found therein will be completed at the time of the seizure or as soon as practical after the seizure."  (Gov. Ex. 3; see also Tr. at 48-51).[21]  Contrary to Reyes' arguments, "nothing in the record suggests that the

---

[21]   Additionally, the GCPD policy provides that "[t]he vehicle and all contraband or evidence should be photographed in positions and conditions in

officers searched the [Mountaineer] in bad faith." United States v. McCalla, 286 F.

App'x 610, 612 (11th Cir. 2008) (per curiam) (unpublished).  Because the GCPD

policy "required that a complete inventory of the vehicle be conducted," and the

officers "acted pursuant to that policy . . . the searches of the [Mountaineer] were

lawful inventory searches." Beckford, 2010 WL 1487817, at *4. See also Walker, 900

F.2d at 1205 (finding warrantless search of vehicle after it was seized for forfeiture

was a valid inventory search where agent testified that it was conducted pursuant

to department policy that requires a complete inventory of the contents of

impounded vehicles).

### III.  CONCLUSION

For the foregoing reasons and cited authority, it is hereby **RECOMMENDED**

that Reyes' motions to suppress intercepted communications, Cr. No. 9, [Doc. 86];

Cr. No. 60, [Doc. 25], be deemed **ABANDONED** and **DENIED**, and that his motions

to suppress evidence and statements, Cr. No. 9, [Doc. 87]; Cr. No. 60, [Doc. 26], be

**DENIED**.[22]

---

which they were found," (Gov. Ex. 3), which the officers did here, (Gov. Exs. 4 & 5).

[22] As previously explained, Reyes has been indicted with additional
defendants, and in Cr. No. 9, matters pertaining to other co-defendants are still
pending. "Pursuant to 18 U.S.C. § 3161(h)(7) (the Speedy Trial Act) the time for
commencing [Reyes'] trial may be stayed until such time as the other [d]efendants
have been certified ready for trial." United States v. Haces-Delgado, Criminal Case
No. 1:09-CR-446-TWT-LTW, 2010 WL 4639229, at *1 n.1 (N.D. Ga. Sept. 15, 2010),

**IT IS SO ORDERED and RECOMMENDED**, this 29th day of August, 2011.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

adopted by 2010 WL 4638869, at *1 (N.D. Ga. Nov. 4, 2010).  Therefore, "it is not necessary to place [Reyes'] case [in Cr. No. 9] on the calendar for trial at this time." Id.  However, with regard to Cr. No. 60, the only other pending motions have been addressed in a separate Report and Recommendation, and the undersigned is not aware of any problems relating to the scheduling of this case.  Accordingly, it is **ORDERED** and **ADJUDGED** that Cr. No. 60 be and the same is hereby certified Ready for Trial.